Good morning. My name is Kristen Ruther for Western Watersheds Project and Center for Biological Diversity. If I could please reserve two minutes for rebuttal. Sure. A preliminary injunction is needed on the Spring Valley Wind Energy Facility because irreparable harm to sage grass is occurring right now and because in the absence of an injunction this large project is going to be built this fall and winter, which is before the District Court can rule on the merits, making a subsequent hard look at the very high risks to native bats that this project poses impossible. This large industrial scale wind energy facility on public lands is currently being built and is going to be built in earnest this fall. Bulldozing six miles of roads and constructing a building was already authorized in April. Bulldozing the remaining 19 miles of new roads across the native sagebrush is authorized to begin in July. Excavating and pouring concrete and steel foundations for the wind turbines is authorized to begin in August and the turbines are scheduled to go up in March 2012 and they're scheduled to start operating in June, less than a year from now. So the bottom line is in the absence of an injunction this facility will be built. Let me ask you the following question because I have, I guess speaking only for myself, I have some concerns because of the limits of our standard of review with respect to a preliminary injunction, which rested in part on a balancing of the equities and so forth. If we were to conclude that the irreparable harm, if any, would occur when the turbines begin operation and not during the construction phase, then wouldn't we have to uphold the preliminary injunction denial even if a further EIS were required? In other words, it seems to me that the question about construction is somewhat separate from the question about is it possible to say no injunction is required at the construction phase but the government has more work to do before they can operate? Your Honor, I believe this court can and should issue that injunction if it finds that irreparable harm would occur from the baths, from the operation of the turbines. Of course, we also explain that the actual construction itself is having irreparable harm on the sage-grouse, native birds that are living on there right now. But if you're focusing on the baths, I believe that can still support a preliminary injunction. Well, why? I mean, the baths are not affected, as I understand your argument, by the construction phase. You're worried about sage-grouse for the construction phase and there's, from my point of view, fewer facts in your favor on the sage-grouse than on the baths. I'm just speaking for myself, obviously, my first impressions. But if there's not an issue with the baths now, why can't construction proceed even if the government can't begin operation until it, for example, puts together an environmental impact statement? Well, the answer to that is based in the standard in Winter v. NRDC. And that is, the question is whether harm is likely in the absence of preliminary relief. And our argument, the reason why we're bringing irreparable harm to baths at play in the irreparable harm factor of an injunction is because if the facility is constructed, it's very likely to operate. And that's because of the large body of case law in this circuit explaining that the point of a hard look is to look at the impacts to a project before it is built. And that a hard look is nearly impossible if a multimillion-dollar facility has already been constructed, complete with poured concrete foundations, maybe even the wind turbines themselves. It's extremely likely that that would prejudice the outcome of an analysis and that BLM would not want to let a multimillion-dollar facility go to waste. Let me ask you a question. As I understand it, when this thing first was proposed, the Fish and Wildlife Service, the National Park Service, a couple of state agencies registered concerns about this. And then they went back to the drawing board, the BLM went back to the drawing board, came up with mitigation measures, and these objectors were then satisfied. Do I have that right? No, it's not that simple to say that the objectors were all satisfied. That's certainly what the BLM argues, but it's not nearly that simple. For example, BLM hangs its hat on a few positive sentences that the Nevada Department of Wildlife, or NDOW, said in its final series of comments. But they don't mention that those comments go on for several pages to list numerous concerns with the project that still exist in its final form, including that BLM should not have tiered to the programmatic EIS because that EIS is inadequate and outdated, because BLM is not following guidance to avoid bat caves, which they are not doing here, that they didn't collect enough data to accurately predict mortality to bats, and that BLM had no data on whether an experimental radar system, which is designed to stop the turbines when bats or birds approach, that BLM actually had no data at all on whether that worked. What was their position after the mitigation measures were proposed? Well, being a state, separate agencies don't really have to say a final position as to whether impacts are significant or not, or go or no-go. So I'm not sure if that's... I'm not asking my question, I guess, correctly. The import of their argument is that these people came up with objections, BLM met them, and that the objections were satisfied. Now, I'm asking you, did they withdraw the objection? Did they say, yeah, okay, that satisfies us? Or what did they do? Well, each agency is different. The final comments were... Okay, let's take the Fish and Wildlife Service. What did they do? Sure. The Fish and Wildlife Service issued, I believe it was a one-page letter at the very end of the process. And I will say that beforehand, they had also issued a letter saying that they would defer on bats to the Nevada Department of Wildlife. So they were mostly issued with birds and other wildlife other than bats. And they said something that we believe that our mitigation is... that the mitigation is appropriate. They didn't address significance or anything like that. So they said the mitigation. What about National Park Service? National Park Service, their final comment in the record is a quite strongly worded, several-page letter saying that they believe impacts are significant, that an EIS is needed, and that it's going to cause significant damage to wildlife resources in the Spring Valley, which is the same valley where the Great Basin National Park is. That was after the mitigation? Yes, yes. Okay, what about... who else was there? Nevada Department of Wildlife? Yes, its final comment letter is in the record at ER 235. It's a couple-page letter. They say that the mitigation has gotten better from the beginning of the process. But then I just listed those remaining concerns that they did have. And I also mentioned in my brief that whether or not they said things in their final letter, you can just look at whether the concerns that were raised in those earlier comments were actually fixed by the final document. And a lot of them are not. For example, NDOW told BLM that having 179 bats die per year was a significant impact that required an EIS. And that was not cured by the final EIS because now... excuse me, the final EA... There was no EIS. That's the problem, right? Because the final one actually raised that threshold to 192 bats. And the entire goal of the mitigation is to meet that level. So it's not like it's going to prevent that level from being reached. Is the focus of your argument that there should be an EIS as opposed to an environmental assessment? Is that what we're really talking about? Yes, Your Honor. That is one of our primary claims. What sort of deference should we give to the agency in making this determination? Your Honor, BLM is not due a lot of deference in this case. And that's because it did not apply expertise on bats in a very well-reasoned way. BLM, in its brief, does try to rebut the expert opinions, showing that its conclusions were contrary to the evidence. But time and again, it only cites to the EA or FONSI finding of no significant impact itself, not to any BLM bat or wildlife expert, explaining why the concerns do not make sense. And this type of unsupported conclusion is not due deference. An agency is only due deference if it explains itself. You wanted to reserve two minutes. I didn't want to interrupt your train of thought, but you're at two minutes, if you need. Okay. Thank you. Hello again. Kurt Kastner for the United States. And I've agreed to cede four minutes of time to intervener's counsel. Let me begin by asking you somewhat the same question I asked opposing counsel, because it's of concern to me. And I know you don't, in any respect, concede that an EIS was required, but I want you to assume for the sake of this question that a full environmental impact statement was required in this instance and wasn't done. Is it possible to segregate parts of this project and allow construction to go forward and still require an EIS be done under our case law? Or if we were to believe that an EIS had to be done, does it all have to be stopped before anything more can happen? I'm not sure if I've made the question clear, but If I understand the question correctly, I think the answer is actually that preliminary relief could not be afforded at this time. Because what the Supreme Court said in winter is that the plaintiff requesting an extraordinary remedy of preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction, and that this irreparable injury must occur before a decision on the merits can be rendered. That's 375. So in your view, is it theoretically possible for us to say that the decision not to issue an EIS was plainly wrong and that it has to be done before any operation of turbines can occur, but nonetheless, no preliminary injunction of construction is required at this time? What would happen if we did that? Your Honor, I believe the way you would do that as a practical matter is you would deny preliminary relief at this time. A briefing is set to close on the motions for summary judgment in December and will be resolved prior to the beginning of operation. And then theoretically, if plaintiffs appeal to the district court, if the district court considered to rule in our favor and plaintiff appealed, you could award preliminary relief at that time, or they could renew it. Well, but what's the point of doing that? If we are convinced on this record that an EIS is required, then presumably the agency could get started doing that, right? That's correct, Your Honor. So it would be to everybody's benefit, I would assume, to know the answer to that question one way or the other, even though, even if we can segregate out the construction phase. Your Honor, I certainly think it's correct that if the court were to award preliminary relief, it should award preliminary relief as limited in scope as possible. I mean, the goal of preliminary relief is to preserve the status quo as best as possible pending a final resolution of the case, and in this instance, if you were to issue a preliminary relief in joining construction, it might jeopardize funding for the project, which would be the case. But not if we were to say that construction can proceed, but no operation until further analysis occurs. That would not jeopardize funding, presumably. I will also let Intervenors Council answer that, but my understanding is that construction needs to be a certain amount underway to qualify for the matching funding, not that the turbines need to be turned on. Right. Okay. So that's what I understood from reading so far, that the money, at least as the district court analyzed it, the money has to go forward for the construction phase at risk of being jeopardized. It has to be obligated for that. That's correct, Your Honor. So I think if you were to award preliminary relief at this stage, we'd request it be as limited as possible to allow construction to proceed. I'd like to also answer your question about the status of agency comments. My understanding is that NDOW has approved the project. The letter that they wrote described the avian and bat protection plan as unique and forward thinking and said that they enthusiastically supported adaptive management. That letter did then have some line item edits for the EA, all of which were addressed in the response to comments in the final environmental assessment. Fish and Wildlife wrote that the EA was appropriate in its adaptive management to avoid and minimize the take of bats, and SNWA wrote that they fully supported BM's approval of the project. The appellants are correct. The National Park Service has never written in supporting the project. I think it's a mistake to say that their criticism of the project came after the project was in its final form. They wrote their letter in February of 2010, and after that there were two meetings with the coordinating agencies. There was an April 26th meeting of BLM, U.S. Fish and Wildlife Service, and NDOW specifically to discuss the various comments that had come in, and then there was a revised draft that was presented both to the agencies and technical experts. So although National Park Service has never written in a second letter, the mitigation continued to develop after the point that they wrote that letter. Western Watershed can't show a likelihood of success or even raise a serious question on its underlying claim. Under the Administrative Procedure Act and this court's ruling in Lands Council v. McNair, an agency has discretion to choose among competing experts. Here 28 experts worked for more than three years to complete a comprehensive environmental assessment, and the appellants have various criticisms of how BLM weighed various expert evidence. None of that establishes that the agency abused its discretion in implementing the project. I'd also note that in addition to not being able to show a likelihood of success and merit or establish irreparable harm, here both the balance of equities and the public interest favor allowing the project to continue. The project will provide the United States with clean, renewable power, which will improve the environment, decrease the nation's dependence on foreign sources of power, and provide a valuable economic benefit to Nevada. A stay would, at a minimum, delay achievement of that goal and may threat the entirety of the project. Meanwhile, the public has a strong interest in the project. Congress has mandated that BLM open public lands for the purpose of developing renewable energy, which articulates a clear public policy in favor of allowing the project to proceed. Does the court have any specific questions about the merits? I'm still concerned about the deference that is due to the agency, the BLM, in their determination after all of the information they got and the mitigation and so forth. Do we not have to find that their decision to rely on an environmental assessment as opposed to an EIS is arbitrary and capricious in order to reverse it? Because we're talking really about whether the agency is arbitrary and capricious, it seems to me, in using an environmental assessment rather than an EIS. That's correct. I believe that's the question in the case. And in that sense, there's sort of two levels of deference that appellants need to overcome. The first is the deference owed to the agency, because the agency is entitled to choose among competing experts in reaching this decision. An abuse of discretion standard applies to that decision. And then the second level of deference is the deference owed to the district court, because district courts have an opportunity to craft preliminary relief in the first instance and the Court of Appeals owes them deference to that end. And we respectfully don't believe that anything that an appellant has brought forward establishes that BLM has engaged in an arbitrary or capricious manner. You mentioned you wanted to defer some time. Good morning. Good morning. May it please the Court, Stan Brand-Erickson for Spring Valley Wind. I would like to start with a question that Judge Graber asked about, which has been addressed by both the other counsel, and note that in this case the district court found, stated in his opinion, that while the issue of whether or not bureaucratic momentum had been raised by the Western Watershed parties, the court also concluded that the mitigation provided in this case was sufficient that the impact of turbine operations also would be insignificant. In other words, the court found that the ---- I know it did, but that's one of the things we're reviewing. So if we disagree with that, do you think that we can segment a decision in the way that I've previously described to allow the construction to go forward but still require a full environmental impact statement with respect to operation? Your Honor, the ---- I would agree with Mr. Kastorf's argument. I'm not going to repeat what he had to say there. Okay. So everybody thinks it's theoretically possible, and some people think you ---- everybody thinks it's a bad idea, I guess, too, for their own different reasons. But ---- If the Court gives a clear indication of its views on whether or not an EIS should have been prepared, I'm sure that the agency and the parties are going to respond to that. We, after all, as a private party, are looking at committing a very substantial amount of money to this project. And, you know, putting money into a project that we're not going to be able to operate would be hard. But the point that I would ask the Court to look at closely is the review that occurred with the agencies. Clearly, the Court's focused on the avian bat protection plan and whether or not it is sufficient to mitigate the effects on bats to insignificance. The resource agencies with expertise in this area were brought in and consulted by BLM and took part in the drafting of the avian bat protection plan, which is detailed, innovative, flexible, directed by BLM. It is not, as Western Watersheds has suggested, discretionary, certainly not for experts, on how to implement this program, which is spelled out in substantial detail, far more detail than you're going to see in almost any kind of adaptive mitigation program that's been proposed under NEPA for almost any kind of project, with looking forward, trying to anticipate what could happen, and anticipating that and providing for measures which, ultimately, you know, what we know from more than 5,000 nights worth of data that's been detected at this site is the behavior of the bats in this area as they migrate through and the period when they're present. And the mitigation measures ultimately would go so far as to effectively take the project out of operation during the time that the bats are present. So all of the issues that have been raised about, you know, whether or not there are questions of fact about how the project would interact with the project, the recognition was that they could not know the answer to some of those questions until the project's actually built. And so to anticipate that, doing more studies now isn't going to answer those questions. So to anticipate and resolve that uncertainty, they built in mitigation measures which would allow operation of this project to be shaped to avoid the time period when the bats are present to the extent necessary to maintain impacts on the bats below the significance threshold identified by the agency. I have one more question. In order for the district judge to have granted an injunction, would he not have had to determine that the decision of the agency was arbitrary and capricious? Yes, Your Honor. He would have had to determine that Western Watersheds was likely to succeed on its claim that the agency was arbitrary and capricious. There was no argument here that the agency has applied the wrong legal standards in its NEPA analysis, nor is there an argument to this Court that the district court judge applied the wrong legal standards in making this decision. Thank you very much, sir. With respect to you, we've got about almost two minutes left. Thank you, Your Honor. With respect to the EIS question, I just respectfully additionally direct the Court to line of case law in this circuit talking about how an irreversible and irretrievable commitment of resources should not be done before the NEPA process is completed, and that such huge amounts of construction would constitute that type of commitment, and it would prevent a hard look at the siting and array of the wind turbines since they would be built. Briefly, a correction on the issue of the National Park Service comments. Counsel seems to have missed a later comment from the National Park Service. He said it was June or Spring, but at ER 317, the comments from the National Park Service were actually in August 2010, which was after their final mitigation plan was finalized, and it discusses why the impacts are significant. Just very briefly on sage-grouse, I just want to explain that the crux of the district court's argument is that because the habitat is not pristine, then it can essentially be written off, and that is very wrong for a species that is warranted for protection under the Endangered Species Act. If we write off all degraded habitat for a species that is warranted for protection under the ESA, that species will spiral into extinction. When a species is in trouble, we need to maintain and restore its remaining habitat, certainly not write off habitat that has been degraded. And finally, with respect to the mitigation plan, the ABPP, its entire structure, unfortunately, is discretionary. It's based on a team giving non-binding guidance to the BLM, and we have in the record a high-level BLM official stating that he's afraid they may not be able to enforce it due to political concerns. And the final issue that counsel mentioned regarding the ability of the, may I just quickly finish my thought? Yes. Regarding how the facility may be shut down during the migration season, I would just like to briefly add that there are 11 species of bats in this nearby cave, and not all of them are migratory. So even shutting it down during that one season doesn't eliminate risks to bats, because bats are there at other times of the year as well. Thank you very much. Thank you very much. I have one question. Oh, Judge, excuse me, ma'am. Yes. Judge Hawke has one more question. I'd like you to answer also this question I posed earlier. You had indicated that the focus of this case is whether an EIS or an environmental assessment is appropriate. In order for the district judge to have issued an injunction, would he not have had to find that the decision of the agency, the BLM, was arbitrary and capricious in deciding that only an EIS, only an environmental assessment was required? Yes, Your Honor, I agree with your statement. That would be the standard of review that the judge looked at under the merits prong of the case. And that arbitrary and capricious standard of review is defined to include that a decision was not based on the evidence in the record, and that is certainly the case here. Okay. Thank you. Thank you to all counsel. The case just argued is submitted. We'll stand in recess for the morning. Thank you. All rise.
judges: Hug, Silverman, Graber, Cjj